**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **No. 09-cr-64** |
| **FRASER VERRUSIO,** | |
| Defendant. | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE HIS CONVICTIONS UNDER § 2255 OR FOR A WRIT OF ERROR CORAM NOBIS

While Fraser Verrusio was the policy director for a U.S. House of Representatives committee considering and drafting new transportation legislation, lobbyists hoping to influence that legislation gave him an all-expenses-paid trip to the 2003 World Series, expecting that he would help them insert specific amendments into the highway bill.  Because he accepted this trip "for or because of" his help with the legislation—indisputably an "official act"—he was convicted of gratuities offenses and sentenced to a single day's incarceration.  His numerous claims on direct appeal were all rejected by the D.C. Circuit.  Now, the defendant moves under 28 U.S.C. §§ 2255 and 1651 to vacate his convictions, relying almost entirely on *McDonnell v. United States*, 579 U.S. __, No. 15-474 (June 27, 2016), to support his argument that his convictions are based on violations of his constitutional rights.  The defendant fails to recognize that his conduct falls squarely within the core of official acts as outlined in *McDonnell*, and he repeatedly understates the substantial evidence of his guilt while brushing aside insurmountable obstacles to relief.  The defendant cannot seek relief under § 2255 because he is not "in custody" and "claiming the right to be released," having served his one day of incarceration long ago.  Even if he were, his claims are procedurally defaulted, meritless, and/or have already been rejected on direct appeal on

grounds unaffected by *McDonnell*.  The defendant also cannot obtain a writ of error coram nobis because he is presently suffering no cognizable collateral consequences as a result of his convictions.  Even if he were, there has been no "fundamental error" justifying the invocation of this extraordinary remedy.  For all of these reasons, the defendant's motion should be denied.

## FACTS & PROCEDURAL HISTORY

### 1.      Offenses & Convictions

The defendant was the policy director for the U.S. House of Representatives' Committee on Transportation and Infrastructure (the "Committee"), responsible for advising the Committee regarding legislative strategy and policy.  *United States v. Verrusio*, 762 F.3d 1, 6 (D.C. Cir. 2014) (direct appeal).  In 2003, the Committee was in the process of drafting a new federal highway bill, and several companies, including construction equipment company United Rentals, sought to influence its language in order "to give United Rentals a competitive advantage."  *Id.*  In exchange for his help influencing the language of the bill, United Rentals lobbyists gave the defendant a trip to the World Series.  *Id.* at 17.

Witnesses at the defendant's trial provided direct, detailed evidence of this gratuity, its purpose, and the defendant's role in providing assistance to United Rentals.  Witnesses included lobbyists Todd Boulanger and James Hirni; United Rentals employee Todd Ehrlich; and Trevor Blackann, a legislative assistant to the then-Chairman of the Senate Subcommittee on Transportation and Infrastructure, which at the time was drafting the Senate version of the new highway bill.  *Id.* at 6.  Boulanger and Hirni discussed with Blackann the three specific amendments United Rentals desired, and Blackann then discussed those proposed amendments with the defendant.  *Id.* at 6-7.  The defendant had a strategy of his own to get United Rentals the amendments it wanted: he told Blackann that he strongly supported a so-called "airmail strategy"

2

to increase United Rentals' chances of success (this entailed "waiting [until] the last possible minute legislatively to insert the provisions"), and Blackann told Boulanger and Hirni of the defendant's idea. *Id.* at 7 (internal quotation marks omitted).

After discussing the defendant's strategy to help United Rentals, Ehrlich, Boulanger, and Hirni decided to invite Blackann and the defendant to the 2003 World Series; Boulanger later testified that the two staffers were invited "because they were in positions to be helpful" in including United Rentals' desired amendments in the highway bill. *Id.* (internal quotation marks omitted). Indeed, the defendant himself admitted to the FBI that he understood "he was asked to go because Ehrlich and Hirni wanted to get something done on the United Rentals agenda" and that the trip "would not have passed the scrutiny of the Ethics Office." *Id.* at 10 (internal quotation marks omitted). Over dinner and drinks in New York—paid for by Ehrlich—all five men discussed United Rentals' proposals, with the defendant leading the conversation and reviewing his favored airmail strategy. *Id.* at 7. Over the course of the evening, Hirni and Ehrlich provided numerous other things of value to the defendant, including liquor; souvenir jerseys; the cover charge, drinks, t-shirts, and lap dances at a strip club; and hotel and transportation expenses. *Id.* at 7-8. The total cost of the trip was $1,259.77, as the parties stipulated at trial. *Id.* at 8. The defendant failed to report this gift on his congressional Financial Disclosure Statement for 2003. *Id.* at 9-10.

Following the New York trip, the defendant continued to communicate with United Rentals lobbyists about helping to push the proposed amendments: he told Hirni in response to an email forwarded from Boulanger that certain proposed text needed "a lot more work"; he stayed "in the loop" with Hirni as the bill worked its way through the Senate; he "helped Hirni understand the likelihood of the Senate language working in the House and when the House was going to act"; he

made specific proposals to United Rentals regarding lobbying strategy; he requested specific proposed language from Hirni; and he reported to Boulanger as the bill was being drafted in the House that he was "hard at it" and that he "fe[lt] good." *Id.* at 8-9 (internal quotation marks omitted). The amendments ultimately did not make it into the final law. *Id.* at 9.

Based on this conduct, the defendant was charged with: conspiracy to receive illegal gratuities, in violation of 18 U.S.C. § 371 (Count One); receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c)(1)(B)[1] (Count Two); and making a false statement on his financial disclosure form, in violation of 18 U.S.C. § 1001 (Count Three). Superseding Indictment, ECF No. 40. At trial, as relevant here, the defendant subpoenaed Vivian Moeglein (née Curry), an employee of a Congressman, seeking her testimony that the defendant did not press her to take action on the highway bill that might be favorable to United Rentals, but this Court granted her motion to quash on Speech or Debate Clause grounds. *Verrusio*, 762 F.3d at 23; *see* Mot. to Quash, ECF No. 105.

The defendant and the government submitted proposed jury instructions; as relevant here, the defendant proposed the following definition of "official act":

> In general, an "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit. Those six terms—"question," "matter," "cause," "suit," "proceeding," or "controversy"—refer to a class of questions or matters whose answer or disposition is determined by the government.

> An act may be an "official act" even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather official acts include those activities that have been clearly established by settled practice as a part of a public official's position.

---

[1] This statute, in pertinent part, provides for criminal penalties if a public official "directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed" by that official. 18 U.S.C. § 201(c)(1)(B). "Official act," as discussed in greater detail *infra*, is further defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

Therefore, "official act" includes the exercise of both formal official influence (such as a legislator's votes on legislation) and informal official influence (such as a legislator's behind-the-scenes influence on other public officials in the legislative or executive branches). However, "official act" does not necessarily include any act within the range of a public official's official duties. For example, every time a public official answers a question, it is not an "official act." Mere favoritism, evidenced by a public official's willingness to take a lobbyist's telephone call or to meet with the lobbyist, is not an "official act." In addition, sharing information with a lobbyist or helping to develop a lobbying strategy does not constitute an official act.

Def't Proposed Jury Instructions, Ex. A, at 1. The District Court delivered virtually identical instructions to the jury at the end of the trial:

In general, an official act means any decision or action on any question, matter, cause, proceeding, or controversy which may at any time be pending or which may by law be brought before any public official in such official's official capacity or in such official's place of trust or profit. Those five terms -- question, matter, cause, proceeding or controversy -- refer to a class of questions or matters whose answer or disposition is determined by the Government.

An act may be an official act, even if it was not taken because of responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part of a public official's position. Therefore, official act includes the exercise of both of formal official influence, such as a legislator's vote on legislation; and informal official influence, such as a legislator's behind-the-scene[s] influence on other public officials in the Legislative or Executive branches.

Mere favoritism, evidenced by a public official's willingness to take a lobbyist's telephone call to answer general questions, or to meet with a lobbyist, is not an official act. Thus it is not enough to show that the defendant accepted the gratuity simply because of his position. You must find that he accepted the thing or things of value for or because of a specific official act he performed or was to perform.

2/7/11 Tr. (AM), Ex. B, at 91-92.

The defendant was convicted on each count, and the District Court imposed a sentence of a single day of incarceration followed by two years' supervised release. Judgment, ECF No. 139.

## 2.    The Defendant's Direct Appeal

The defendant raised four arguments on direct appeal, contending that:

> (1) the district court erred in denying his pretrial motion to dismiss Count Two because the indictment failed to allege an "official act"; (2) the evidence was insufficient to convict on Counts One and Two because it failed to show that he conspired to perform or did perform an official act; (3) the evidence failed to show that he made a false statement on his financial disclosure form; and (4) the district court committed reversible error in excluding a defense exhibit and quashing a defense subpoena.

*Verrusio*, 762 F.3d at 11.  The D.C. Circuit rejected each of these arguments and affirmed.

As to the first, it held that the indictment was plainly sufficiently specific in its allegations of official acts, noting that "one of the official acts specified in Count Two was assisting in United Rentals' 'efforts to secure favorable amendments to the Federal Highway Bill,' by, among other things, 'influencing the language of the Federal Highway Bill,'" and that this act met the statutory definition in § 201(a)(3) because "the question of whether the amendments should be added to the bill was 'pending' before and to be answered (at least partly) by the committee for which Verrusio was the policy director."  *Id.* at 14 (quoting Indictment ¶ 28).

As to the second, the panel flatly rejected the defendant's contention that the evidence was not sufficient to prove an official act.  In relevant part, the panel held that the evidence presented at trial showed that: "United Rentals wanted specific amendments inserted into the then-pending federal highway bill"; lobbyists Boulanger and Hirni were "working with" the defendant as well as with Blackann in the Senate; United Rentals employee Ehrlich and the two lobbyists "[t]ogether" decided to invite the defendant to the World Series because he was "in [a] position[] to be helpful" with those amendments, and Boulanger testified that he "knew that Verrusio was close to the chairman of the House Committee and hoped to influence him"; and post-World Series events provided "circumstantial confirmation of the parties' original intentions," including "substantial evidence that Verrusio . . . kept trying to help with the language [in the House bill] until the very end."  *Id.* at 15-16 (internal quotation marks omitted).  The panel concluded that this

evidence was sufficient to prove that the trip to the World Series was offered for a particular official act, i.e., "influencing the language of the federal highway bill"; that the defendant "accepted the gift knowing it was being given" for this reason; and that even though the defendant may not have been personally responsible for drafting or approving legislative language, he "was well-positioned to influence" it. *Id.* at 16-19.

As to the third, the panel reviewed ample evidence of the defendant's false statements on his disclosure forms, including the defendant's own acknowledgement to the FBI that "he knew he should have disclosed the trip." *Id.* at 20 (internal quotation marks omitted). It concluded that the statements were both false and materially so, as required under 18 U.S.C. § 1001(a)(2), as there was evidence that the defendant "interfered with the Ethics Committee's ability to perform its function of monitoring compliance with relevant rules," including testimony that an Ethics Committee staff attorney had to repeatedly follow up with the defendant in an ultimately fruitless attempt to explain inconsistencies in his disclosure forms. *Id.* at 20-21.

As to the fourth and final argument on direct appeal, the panel held that this Court should have allowed the defendant to offer certain disclosure form instructions into evidence but that this error was harmless (a conclusion the defendant does not appear to dispute in the motion now before the Court). *Id.* at 21-23. Finally, the panel addressed the defendant's argument that this Court should have denied Moeglein's motion to quash her subpoena on Speech or Debate Clause grounds: it first noted that, as the defendant conceded, no court has ever held "that a defendant's Fifth and Sixth Amendment rights trump the Speech or Debate Clause privilege," and it went on to hold that the defendant had not shown that Moeglein's testimony would have been in any way material. *Id.* at 23-24.

3.      **This Motion &** *McDonnell*

The defendant now returns to this Court with a motion to vacate his convictions either under § 2255 or, in the alternative, through the extraordinary remedy of a writ of error coram nobis. The defendant advances a variety of arguments, most of which were considered and rejected by the D.C. Circuit on direct appeal and some of which appear to have no connection to a legal basis for relief.   The defendant relies almost entirely on the Supreme Court's recent decision in *McDonnell*, but the Court's opinion serves only to underscore that his conduct fits squarely within the core of the definition of "official act."

In *McDonnell*, the Supreme Court reinforced well-established principles of bribery law, providing guidance and clarification as to what constitutes an "official act."[2]  *See McDonnell*, No. 15-474, slip op. at 19.  The Supreme Court held that the jury had not been properly instructed on the meaning of "official act," and it therefore clarified the definition and outlined two requirements for proving an "official act."  *Id.* at 17-21.  First, the government must identify a "question, matter, cause, suit, proceeding or controversy" that involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 21.  The matter must be "pending" or one that "may by law be brought" before any public official, meaning that the matter must be "relatively circumscribed" and, with respect to a matter that may by law be brought, "something within the specific duties of an

---

[2] Although Governor McDonnell, unlike the defendant here, was not a federal official and was not charged under 18 U.S.C. § 201, the parties had agreed that they would define "official act" in an honest services fraud and Hobbs Act case by reference to the definition in the federal bribery and gratuities statute, 18 U.S.C. § 201(a)(3).  *McDonnell*, No. 15-474, slip op. at 9.  That same definition applies to the conspiracy and gratuities offenses of which this defendant was convicted. *See Verrusio*, 762 F.3d at 11-12; *see generally United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999) (explaining differences between the bribery offense of § 201(b) and the gratuities offense of § 201(c), both of which involve official acts).

official's position—the function conferred by the authority of his office." *Id.* at 17.  Second, the public official must "make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.* at 21.  The Court explained that merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more" is not sufficient.  *Id.*  However, an official act does include "using [one's] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.*  Further, in addition to "a decision or action" on a matter involving the exercise of governmental power, such as the initiation of a research study at a government institution, "a decision or action on a *qualifying step*" toward that final decision, "such as narrowing down the list of potential research topics," also qualifies as an "official act." *Id.* at 19 (emphasis added).

Accordingly, with respect to this case, *McDonnell* simply sets forth what instructions must be provided so that juries properly identify official acts.

## ANALYSIS

After this Court delivered the defendant's requested jury instructions defining "official act" almost verbatim, the defendant was convicted on all counts, and his convictions were affirmed on direct appeal.  As the unambiguous language of *McDonnell* makes abundantly clear, the defendant's conduct, for which he received an illegal gratuity that he unlawfully failed to report, fell squarely within the definition of "official act."  The defendant now has no basis on which to seek post-conviction relief, and this Court should deny the defendant's motion for several reasons. First, the defendant's motion under § 2255 should be denied because he does not meet the statutory requirement that he be "in custody."  Further, even if the defendant could seek relief under § 2255, *McDonnell* only makes it more plain that the gratuity for which he was convicted was given for

his official action—i.e., influencing the text of a bill being drafted by the Committee on which he had a leadership role—and he identifies no other basis for relief.   Second, the defendant's alternative attempt to obtain a writ of error coram nobis should be denied because he is presently suffering no cognizable adverse consequences flowing from his convictions, and even if he were, nothing he has identified—not even *McDonnell*—renders his convictions fundamentally erroneous.

## 1.      The Defendant Cannot Meet the Requirements of § 2255

Under § 2255, a court may "grant relief only if [it] determine[s] that the challenged sentence resulted from a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure."   *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (internal quotation marks omitted).   A procedurally defaulted claim that has not been raised on direct review "may be raised in habeas only if the defendant can first demonstrate either [(1)] cause and actual prejudice, or [(2)] that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal quotation marks and citations omitted).   Further, an issue or contention previously raised but rejected on direct appeal cannot be the basis of a § 2255 motion absent an intervening change in the law.   *United States v. Greene*, 834 F.2d 1067, 1070 (D.C. Cir. 1987).   "[M]ere lack of success on [direct] appeal does not pave the way for collateral attack." *Garris v. Lindsay*, 794 F.2d 722, 727 (D.C. Cir. 1986).   Here, because the defendant is not "in custody," he cannot seek § 2255 relief at all.   Even if he could, his claims are procedurally defaulted, frivolous, and/or were squarely rejected on direct appeal, and *McDonnell* does nothing to render his rejected claims meritorious.

a.      The Defendant Is Not "in Custody"

First, as the defendant himself acknowledges, he is not "in custody" and therefore cannot claim "the right to be released" for the purposes of § 2255. *See* Mot. at 12 ("Mr. Verrusio acknowledges that he is not currently subject to any restriction that the current weight of authority views as meeting the 'in custody' requirement of section 2255(a)."). A defendant must generally be *serving* the sentence being challenged to bring a habeas petition under § 2255; a defendant who has completed that sentence is not in custody, notwithstanding "the possibility that the prior conviction will be used to enhance the sentences imposed for any subsequent crimes of which he is convicted." *Maleng v. Cook*, 490 U.S. 488, 492 (1989); *see also United States v. Kramer*, 195 F.3d 1129, 1130 (9th Cir. 1999) (collecting cases holding "that § 2255's language clearly and unambiguously limits its applicability to defendants seeking release from custody").

Here, the defendant was sentenced on August 5, 2011, to a single day of incarceration followed by two years' supervised release. Judgment, ECF No. 139. That sentence was completed years before the defendant filed his motion. This Court therefore cannot consider its merits.

b.      *McDonnell* Does Not Rescue Rejected or Procedurally Defaulted "Official Act" Claims

Even if this Court could reach the merits of the defendant's § 2255 motion, he would be entitled to no relief based on *McDonnell*. As an initial matter, the defendant's "official act"-related arguments in his motion are virtual carbon copies of the arguments presented and rejected on direct appeal. *Compare* Mot. at 12-19 (contending the indictment failed to allege, and the evidence failed to prove, an "official act") *with Verrusio*, 762 F.3d at 14-19 (holding the indictment alleged, and the evidence was sufficient to prove, an "official act" for or because of which gratuities were provided). These warmed-over arguments cannot be resuscitated here. *Greene*, 834 F.2d 1070.

To the extent that *McDonnell* by itself provides any new avenues through which the defendant might seek relief, it simply clarifies the definition of "official act"—and here, the defendant's requested jury instructions on that subject were provided almost verbatim to the jury at trial.  The defendant did not take issue with those instructions on direct appeal, and he does not mention them in his motion.  Thus, even if the defendant were taking issue with the jury instructions, any claim that the jury should have been instructed differently under *McDonnell* would be procedurally defaulted.  *See Bousley*, 523 U.S. at 622.  To overcome this hurdle, the defendant must show either: (1) "both cause for the procedural default and actual prejudice," *United States v. Kleinbart*, 27 F.3d 586, 590 (D.C. Cir. 1994); or (2) that he is "actually innocent"—that is, that "it is more likely than not that no reasonable juror would have convicted him" absent the supposed errors in the defendant's trial, *United States v. Baxter*, 761 F.3d 17, 26-27 (D.C. Cir. 2014) (internal quotation marks omitted).  The defendant can show neither.

The jury was instructed as the defendant requested, and he cannot show either that the absence of more specific jury instructions resulted in any actual prejudice or that he is actually innocent.  As the D.C. Circuit made abundantly clear on direct appeal, the ample evidence at trial was such that "a reasonable juror could readily have concluded that the World Series trip was given and received 'for or because of some *particular* official act'—that is, for influencing the language of the federal highway bill."  *Verrusio*, 762 F.3d at 17 (quoting *United States v. Sun-Diamond Growers*, 526 U.S. 398, 405-07 (1999) (emphasis added in *Verrusio*)).  This plainly still qualifies as an "official act" under *McDonnell*, both based on what the defendant could accomplish himself and based on his ability to advise or exert pressure on others.

As testimony at the defendant's trial made clear, he was invited to the World Series because he was "in [a] position[] to be helpful" in getting amendments United Rentals wanted added into

12

legislation being written in the House—something he was certainly well-positioned to do from his perch as policy director for the Committee. *Id.* at 7 (internal quotation marks omitted). The defendant's actions here went far beyond merely "hosting an event, meeting with other officials, or speaking with interested parties . . . standing alone." *McDonnell*, No. 15-474, slip op. at 19. The fact that the defendant himself could not have unilaterally rewritten, passed, and signed into law a highway bill with all United Rentals' desired amendments baked in is not dispositive: "[a] public official may . . . make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act,'" and "if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify as a decision or action for purposes of § 201(a)(3)." *Id.* (quoting 18 U.S.C. § 201(a)(3)). Further, the defendant need not even "actually make a decision or take an action" to meet the statutory requirement, and "a decision or action on a qualifying step" toward a later decision or action, like helping to draft a bill before it becomes a law, is itself an "official act." *Id.*; *see also Verrusio*, 762 F.3d at 18 (explaining that it does not "matter whether Verrusio succeeded in influencing the language—or even tried to do so," as "'the anti-gratuity provision has no requirement that the payment actually influence the performance of an official act'" (quoting *Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007)). Finally, precisely how the defendant would accomplish these goals need not have been spelled out in advance: "the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, No. 15-474, slip op. at 19.

This official action is precisely what the evidence showed the World Series trip was "for": again, testimony showed that the defendant was invited because he was "in [a] position[] to be

helpful" with getting the amendments added to the bill because of his position on the Committee, Boulanger testified that he "knew that Verrusio was close to the chairman of the . . . Committee and *hoped to influence him*," and "there was . . . substantial evidence that Verrusio . . . kept trying to help with the language until the very end." *Verrusio*, 762 F.3d at 16 (internal quotation marks omitted) (emphasis added).  In other words, the hoped-for official action included exerting pressure on other public officials and providing advice to other officials as they drafted and considered pending legislation: precisely what *McDonnell* defines as official action.  Thus, *McDonnell*, the only new development in the law the defendant identifies since his direct appeal, has no practical effect on his guilt, and the evidence presented at trial proves an official act well within *McDonnell*'s boundaries.

   c.  The Defendant's Three Remaining Claims Are Meritless

   The defendant also presents three other arguments unrelated to *McDonnell*.  These fare no better.  First, he contends that his Fifth and Sixth Amendment rights were violated when this Court granted Moeglein's motion to quash her subpoena on Speech or Debate Clause grounds.  Mot. at 20-22.  The defendant fails to discuss the D.C. Circuit's rejection of precisely this argument when it was presented on direct appeal.  The panel reasoned that the defendant "has not shown that Moeglein's testimony was material," a requirement for its exclusion to have possibly violated the defendant's constitutional rights: he proffered both at trial and on appeal that she would have testified "about her interactions with Hirni, including his offer to buy her lunch and his offer of tickets to a sporting event," but of course "the fact that the lobbyist offered other staffers gifts hardly exculpates Verrusio, whether or not those gifts constituted illegal gratuities." *Verrusio*, 762 F.3d at 24 (internal quotation marks omitted).  Further, the defendant's argument that Moeglein's testimony was material because she "would have testified that she discussed United Rentals with

Mr. Verrusio and he never told her that he intended to do anything to advance their agenda," Mot. at 21, was also squarely rejected by the D.C. Circuit, which noted correctly that "the government was not required to show that Verrusio took any affirmative steps to add United Rentals' amendments to the federal highway bill," *Verrusio*, 762 F.3d at 24; *see also id.* at 18 (explaining that it does not "matter whether Verrusio succeeded in influencing the language—or even tried to do so"). Moreover, "the fact that Verrusio did not pressure one staffer is no (or, at best, extraordinarily weak) evidence that he did not try to influence others." *Verrusio*, 762 F.3d at 24. Because this argument was presented to and squarely rejected by the D.C. Circuit on direct appeal, and because no intervening change in law affects the materiality of Moeglein's proffered testimony, § 2255 cannot provide relief. *Greene*, 834 F.2d at 1070.

Second, the defendant lobs scattershot accusations of impropriety toward the government, contending that: an Assistant Attorney General would not meet directly with the defendant, Mot. at 22; the defendant requested identification of specific official acts and the government satisfied his request in its superseding indictment, Mot. at 22-23; the government brought a potential conflict of interest to this Court's attention and requested a hearing on the subject prior to trial but apparently raised this issue less quickly than the defendant would have preferred, Mot. at 23-24; and the defendant sought a continuance to review additional emails he believes the government should have disclosed earlier, Mot. at 24-26.[3] Nothing here is remotely improper. The defendant's vague conclusion that the government's "conduct should not be tolerated or encouraged," Mot. at 26, has no apparent bearing on the legal integrity of his convictions.

---

[3] The defendant's motion fails to mention that his motion for a continuance was granted. Minute Order, Nov. 5, 2010. The defendant does not now allege that he did not receive all the time he needed to prepare for trial.

Third and finally, the defendant insinuates that the resignation of the District Judge who oversaw his trial "raise[s] at least the specter that Mr. Verrusio's right to a fair and impartial tribunal was violated," but he requests that this claim be held in abeyance. Mot. at 26. Here, too, there is nothing in the defendant's motion that bears on the integrity of his convictions.

Accordingly, this Court should reject the defendant's effort to vacate his convictions through § 2255. Because he is not "in custody," he simply cannot seek any relief whatsoever under § 2255. Even if he could, his claims are meritless, *McDonnell* notwithstanding.

## 2.      The Defendant Is Not Entitled to Coram Nobis Relief

The writ of error coram nobis, which federal courts may grant pursuant to the All Writs Act, 28 U.S.C. § 1651, is "an extraordinary tool to correct a legal or factual error." *United States v. Denedo*, 556 U.S. 904, 912-13 (2009). "Courts may grant coram nobis relief only in extraordinary cases where it is necessary to achieve justice." *United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015) (internal quotation marks omitted). The defendant here bears the burden of overcoming a presumption that the challenged judicial proceedings were correct. *United States v. Morgan*, 346 U.S. 502, 512 (1954).

Although the D.C. Circuit has yet to squarely address the particular factors that are to be considered in deciding whether to grant a writ of error coram nobis, *see Newman*, 805 F.3d at 1146, courts in this district require petitioners to satisfy the following four:

> (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*United States v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C. 2013) (quoting *United States v. Hansen*, 906 F. Supp. 688, 692-93 (D.D.C. 1995)). The defendant's petition for this writ must be rejected because he cannot satisfy either the third factor or the fourth.

16

a.      The Defendant Suffers No Cognizable Adverse Consequences

As to the third factor, a writ of error coram nobis should issue only when the defendant can

show that he suffers an ongoing legal disability that follows from his conviction by operation of

law. *See Fleming v. United States*, 146 F.3d 88, 90-91 (2d Cir. 1998). A "purely speculative"

disability, such as a claim that a petitioner is statutorily barred from seeking a job he has never

sought and has no plans to seek, is insufficient. *Id.* (rejecting argument that petitioner was entitled

to coram nobis relief because he was statutorily barred from licensure as a securities broker but

presented no evidence that he had "sought and been denied licensure as a securities broker, that he

ha[d] ever been so employed in the past, or that he could obtain such employment but for his

conviction"); *see also United States v. Esogbue*, 357 F.3d 532, 534 (5th Cir. 2004) (requiring

petitions to "demonstrate civil disabilities as a consequence of the conviction" (internal quotation

marks omitted)); *United States v. Bush*, 888 F.2d 1145, 1148 (7th Cir. 1989) ("[C]oram nobis is

unavailable unless the prisoner is still suffering civil disabilities unique to criminal convictions. . . .

[T]he reputational injury from conviction . . . does not suffice." (internal quotation marks,

alteration, and citation omitted)); *United States v. Osser*, 864 F.2d 1056, 1060 (3d Cir. 1988)

("Damage to reputation is not enough.").[4]

---

[4] The government acknowledges that the D.C. Circuit has yet to decide to what extent a concrete ongoing disability must be shown for a petitioner to be eligible for a writ of error coram nobis, and that the other Courts of Appeals are not unanimous. *See Fleming*, 146 F.3d at 91 n.3 (noting that the Ninth and Fourth Circuits "apparently assume that any conviction necessarily leads to continuing legal consequences for purposes of coram nobis relief," but rejecting this "open-ended approach" as "inconsistent with the Supreme Court's admonition . . . that coram nobis relief is to be treated as an 'extraordinary remedy'" and because "a requirement that the petitioner identify a concrete and serious legal consequence of his conviction appropriately works to reinforce the finality of judgments" (quoting *Morgan*, 346 U.S. at 511)). Because the writ is an extraordinary remedy and the finality of criminal judgments should be protected, this Court should adopt the approach of the plurality of circuits cited in the text and require a concrete legal disability.

Here, the defendant alleges nothing but speculative future consequences of his convictions of the sort that numerous Courts of Appeals have repeatedly rejected. *See* Mot. at 27-28 (claiming "federal and state law severely restrict his right to bear arms," states where the defendant does not reside disenfranchise certain people with criminal convictions, his convictions "ha[ve] an impact on where Mr. Verrusio can serve on a jury, and on what other countries he can visit," and his convictions "ha[ve] other consequences"). But the "desire to be rid of stigma," *Fleming*, 146 F.3d at 90, and reputational injury, *see Osser*, 864 F.2d at 1060, are insufficient, as is a possible future legal disability (such as statutory restrictions on firearm purchases, international travel, voting, or jury service) in the absence of any likelihood that the defendant will actually seek to engage in the barred activity or ever reside in or even visit a place where those statutory restrictions exist, *see Fleming*, 146 F.3d at 91; *United States v. Craig*, 907 F.2d 653, 660 (7th Cir. 1990). For these reasons, this Court should deny the defendant's petition for a writ of error coram nobis before even reaching its merits.

b.      There Was No Fundamental Error

Even if this Court reaches the merits of the defendant's petition, it should hold that he cannot demonstrate entitlement to the writ because he has made no showing of an error "of the most fundamental character." *See Faison*, 956 F. Supp. 2d at 269. This standard is quite high: "judgment finality is not to be lightly cast aside[,] and courts must be cautious so that the extraordinary remedy of coram nobis issues only in extreme cases." *Denedo*, 556 U.S. at 916; *see also Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("[I]t is difficult to conceive of a situation in a federal criminal case today where a writ of coram nobis would be necessary or appropriate." (internal quotation marks and alteration omitted)); *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 n.3 (10th Cir. 2010) (requiring an error "so fundamental as to render the proceedings

themselves irregular and invalid" and explaining that "in the interests of promoting the finality of appeals, the standard for obtaining relief through coram nobis is more stringent than the standard applicable on direct appeal"); *United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990) (describing an error "of the most fundamental character" as one "that has resulted in a complete miscarriage of justice").  Here, as explained *supra*, the defendant's arguments were for the most part addressed and rejected by the D.C. Circuit under the more forgiving standards applicable on direct appeal. The defendant's only contention in his motion with respect to the "fundamental error" requirement is that his "conviction is premised on lawful conduct," Mot. at 28, but, as the above analysis of *McDonnell* makes clear, his gratuities convictions are premised on nothing of the kind, and the D.C. Circuit's identification of official acts plainly passes muster in the wake of *McDonnell*. Therefore, even if it reaches the merits of his petition for a writ of error coram nobis, this Court should deny it as meritless.

**3.      Conclusion**

The defendant is not "in custody," so he cannot seek relief under § 2255.  The defendant suffers no cognizable adverse consequences from his convictions, so he cannot seek a writ of error coram nobis.  Even if this Court were to reach the merits of the defendant's motion, he has failed to articulate any defect in his trial that entitles him to relief.  With respect to *McDonnell* specifically, the Supreme Court's clarification of the definition of "official act" merely makes it even clearer that the defendant's case falls well within it.  For these reasons, the defendant's motion should be denied.

Respectfully submitted,

RAYMOND HULSER
Chief, Public Integrity Section

By: /s/ *Andrew Laing*
Andrew Laing
United States Department of Justice
Public Integrity Section
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 353-8433
Andrew.Laing@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2016, I electronically filed a copy of the foregoing, and it is available for viewing and downloading from the ECF system.


<u>/s/ *Andrew Laing*    </u>
Andrew Laing
Trial Attorney